IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

RICHARD W. MCCREARY,      )
                          )
          Plaintiff,      )
                          )
     v.                   )   Case No. 05-0507-CV-W-REL-SSA
                          )
JO ANNE BARNHART, Commissioner )
of Social Security,       )
                          )
          Defendant.      )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Richard W. McCreary, seeks review of the final
decision of the Commissioner of Social Security denying
plaintiff's application for a period of disability and disability
insurance benefits under Titles II and XVI of the Social Security
Act ("the Act").  Plaintiff argues that (1) the ALJ incorrectly
evaluated the credibility of plaintiff's subjective complaints,
and (2) the ALJ improperly posed a hypothetical question that did
not accurately and completely detail all of plaintiff's
impairments.  I find that the ALJ properly evaluated plaintiff's
subjective complaints, and properly posed a hypothetical question
to the vocational expert based on the credible evidence in the
record.  Therefore, plaintiff's motion for summary judgment will
be denied and the decision of the Commissioner will be affirmed.

1

## I.  BACKGROUND

This suit involves two applications made under the Social Security Act (the Act). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq. The second is an application for supplemental security income benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner of the Social Security Administration under Title II. Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review to the same extent as the Commissioner's final determination under section 205.

Plaintiff protectively filed his applications for disability benefits on September 3, 2002 (Tr. 81-84, 307-09). His application for benefits was denied (Tr. 57-61). On September 23, 2004, following a hearing, an administrative law judge rendered a decision finding plaintiff was not "disabled" as defined by the Act (Tr. 14-19). On March 31, 2005, the Appeals Council denied plaintiff's request for review (Tr. 5-7). Thus, the ALJ's decision is the final decision of the Commissioner.

## II.  STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The

standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>,
402 U.S. 389, 401 (1971); <u>Mittlestedt v. Apfel</u>, 204 F.3d 847,
850-51 (8th Cir. 2000); <u>Johnson v. Chater</u>, 108 F.3d 178, 179 (8th
Cir. 1997); <u>Andler v. Chater</u>, 100 F.3d 1389, 1392 (8th Cir.
1996). The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision. <u>Universal Camera</u>
<u>Corp. v. NLRB</u>, 340 U.S. 474, 488 (1951); <u>Thomas v. Sullivan</u>, 876
F.2d 666, 669 (8th Cir. 1989). "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory." <u>Wilcutts</u>
<u>v. Apfel</u>, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing <u>Steadman v.</u>
<u>Securities & Exchange Commission</u>, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It
means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion." <u>Richardson v. Perales</u>, 402
U.S. at 401; <u>Jernigan v. Sullivan</u>, 948 F.2d 1070, 1073 n. 5 (8th
Cir. 1991). However, the substantial evidence standard
presupposes a zone of choice within which the decision makers can
go either way, without interference by the courts. "[A]n
administrative decision is not subject to reversal merely because

3

substantial evidence would have supported an opposite decision."
Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

4

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

## IV. THE RECORD[1]

The record consists of the testimony of plaintiff and vocational expert, Lesa Keen, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

On September 3, 2002, plaintiff completed his application for disability insurance benefits in which he listed his

---

[1]The underlying facts in this case are largely a matter of stipulation between the parties. See Brief for Defendant, pp. 2-4, where the Commissioner adopts plaintiff's statement of the facts, and offers four additional paragraphs of supplemental facts for consideration.

5

disability onset date as April 28, 2000, and disclosed that he has at times used the name Richard Scott Watson, last name being that of his natural father (Tr. 81-83).

On September 3, 2002, plaintiff completed his application for supplemental security income (Tr. 307-09).

Plaintiff's indexed-earning records reflect the following income for the years indicated:

| Year | Income |
|------|--------|
| 1983 | 3504.32 |
| 1984 | 6573.69 |
| 1985 | 15853.00 |
| 1986 | 17335.79 |
| 1987 | 17421.19 |
| 1988 | 18549.97 |
| 1989 | 19665.85 |
| 1990 | 20716.64 |
| 1991 | 10217.97 |
| 1992 | 15521.67 |
| 1993 | 7238.49 |
| 1994 | 8079.20 |
| 1995 | 751.39 |
| 1996 | 3343.93 |
| 1997 | 11262.13 |
| 1998 | 13349.12 |
| 1999 | 19112.54 |

```
2000      16613.55

2001      10802.97

2002       7466.00

2003       2663.69
```

(Tr. 85-86).

On September 3, 2002, plaintiff completed a disability report in which he listed his disabling conditions as "depression, anxiety (generalized anxiety disorder, major depression disorder, recurrent)[and] suicidal" (Tr. 87-96). Concerning the implications of these alleged disorders, plaintiff wrote:

> Anxiety and depression caused me to isolate and withdraw and be unable to go to work many days. Anxiety attacks caused poor working relationships [with] others. I was counseled on this [unintelligible] absenteeism, often.

(Tr. 88). Plaintiff also indicated that he had been receiving vocational rehabilitation services from the State of Missouri from May 2000 to the date of the report, September 3, 2002 (Tr. 94).

On September 3, 2002, plaintiff completed a work activity report in which he reported his working despite his alleged illness (Tr. 97-102). Plaintiff indicated that he worked in security for The Neighborhood Group from July 2001 to the date of the work activity report, earning $9.00 an hour for 16 hours per week (Tr. 98).

7

On October 17, 2002, plaintiff's roommate completed a third-party questionnaire concerning plaintiff's daily activities (Tr. 115). As to difficulties witnessed, the roommate wrote: "distrust, paranoia, increased depression, decreased self-worth." The roommate also indicated that plaintiff has experienced difficulty in relating to other people because he becomes verbally abusive over insignificant matters. As to other observations, the roommate reported that plaintiff does not enjoy social gatherings, stays indoors most of the time, frequently misses his classes, avoids driving because it frightens him, and often forgets to eat.

On October 17, 2002, plaintiff completed a claimant questionnaire in which he listed his then-current medications as Celexa,[2] Wellbutrin,[3] and Trazodone[4]; and complained that the medications "don't work" (Tr. 116-19).

On October 18, 2002, plaintiff brought his paperwork to the Social Security office, and the office worker observed:

- Plaintiff reported that he left his downtown home at 8:00 am and arrived at the office at 10:00 am;

---

[2]Celexa is used to treat depression. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[3]Wellbutrin is a medication prescribed for plaintiff's depression. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[4]Trazodone is used to treat depression. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

8

- Plaintiff recounted his last hospital visit and started to cry at the end;

- Plaintiff and the worker discussed making copies of the paperwork, but when that was accomplished plaintiff had forgotten about the conversation and seemed surprised; and

- Plaintiff appeared to have poor concentration.

(Tr. 121-22).

## B. SUMMARY OF MEDICAL RECORDS

On June 13, 2000, plaintiff went to Truman Medical Center Emergency Department with complaints of nausea, diarrhea, and vomiting. He was assessed with diarrhea (Tr. 194).

On July 30, 2001, plaintiff went to Keith Allen, Ph.D., licensed psychologist, for a psychological evaluation. Plaintiff was late for his appointment. He was given the Wechsler Adult Intelligence Scale-III ("WAIS-III"), Minnesota Multiphasic Personality Inventory ("MMPR"), and a psychological consultation. Plaintiff reported that:

- He graduated from high school in 1984 without having to repeat any grades and without special education classes except briefly.

- He was in the Navy from 1984 to 1991 and received an honorable discharge. He attained the rank of E-4 and was in aviation supply. He reported that the reason he left the Navy was that he was a witness to a rape case and "they were watching me and found out that I was gay. They offered to exchange my testimony for an honorable discharge."

- He worked as a certified nurse assistant, certified medical technician, hair dresser, cashier, and security guard.

9

- His longest held job outside the Navy was three years. He reports that he normally leaves jobs because he could not sit still and he's "gotta move."

- He was fired once for insubordination and another time when an assistant manager asked if he threatened to hit anyone and he said he did not know and was told that was not an adequate response.

- He started mental health treatment at Truman Medical Center Behavioral Health one year ago and was diagnosed with depression and continues on Wellbutrin. He reported that this medication does not help him, but he had only been on it for three weeks.

- He reported symptoms of anger, hostility and suicidal ideation.

- He was not currently receiving counseling although he was told he was supposed to. He indicated that he does not want to go into counseling because "I don't want people getting into my business."

As to his assessments, the test results showed:

- Plaintiff's WAIS-III scores placed him in the average intelligence classification. His scores were: verbal IQ 95, performance IQ 116, and a full scale IQ of 104.

- Plaintiff's responses on the MMPI Profile Validity Scales indicated that he admitted to a large number of unusual thoughts, feelings and behaviors.

- His validity scales and Weiner-Harmon subtle-obvious subscales suggested a conscious attempt to exaggerate his symptoms and an attempt to present himself in an unfavorable light. His responses were similar to persons who are depressed with anxiety and agitation. Excessive anger directed towards themselves or others was often found. These individuals tend to worry excessively and have difficulty thinking and concentrating. They tend to be anxious and nervous. Resentfulness, hostility and aggressiveness might be present. Their judgement is often impaired and they frequently fail to learn from experiences. These individuals often have longstanding feelings of inferiority and inadequacy that date from childhood. They very often feel that they are the inferior member

10

of the family. They are often repeatedly hurt in childhood, resulting in fears of being hurt as adults. Blame for their shortcomings is frequently projected on others. As children, they are generally shy and lacking confidence.

Psychological consultation revealed plaintiff believes that he is a depressed person because he has difficulty learning things.

Plaintiff reported that:

• He has crying spells every two weeks.

• He feels anxious if things are really "quiet or still. I don't like aggressive people. I don't like fast moving people or things."

• His sleep is fair.

• He has suicidal ideations and when asked how he would kill himself, he reported "quickly."

• He has homicidal ideation of "no one in particular."

• He feels helpless, hopeless or worthless.

• He hears voices in the middle of the night telling him his closet was out of order and he must get up to find what shirt was turned backwards or what button was missing. These "auditory hallucinations" did not appear to be pathological but rather night-time obsessions.

• He has no friends with whom he does things because "I just don't like to be with people." When asked to described himself he replied, "I'm not smart."

• Plaintiff was experiencing depression and this continued to be somewhat of a factor despite psychiatric treatment. His depression appears to be long standing and related to more than just his problems with learning.

• He has had a chaotic developmental history that appears to have had long-standing effect.

11

Continued treatment for plaintiff's depression was necessary to insure his functioning at his maximum potential.

Plaintiff was diagnosed with depressive disorder and personality disorder with schizoid, avoidant and obsessive-compulsive features (Tr. 172-77).

From June 11, 2001, to July 2, 2001, plaintiff went to the Rehabilitation Institute for comprehensive vocational evaluation services in order to determine a realistic vocational objective and to generate recommendations for additional services as needed (Tr. 129-32). Plaintiff was referred due to his diagnosis of depression (Tr. 129).

Plaintiff's goal was to attend Penn Valley Community College to obtain an Associates Degree in Radiology. His classes were scheduled to begin in August 2001.

Based upon the results of this assessment, it was suggested that plaintiff would benefit from participation in the ABLE program to assist him in his college classes. It was felt that plaintiff would benefit from counseling/therapy to assist him in his general adjustment to college training and demands, as well as in his overall personal well being. At that point, plaintiff was medication compliant (Tr. 129-32).

On October 4, 2002, plaintiff was examined at the Truman Health Center (Tr. 209). The examining physician noted that plaintiff was exaggerating his symptoms (Tr. 209). Plaintiff had

12

adequate affect, good sleep and appetite, and he reported taking Trazodone[5] on an as-needed basis (Tr. 209). The doctor observed that plaintiff was not a "reliable source [of information because] he change[d] his story multiple times" (Tr. 209).

On October 6, 2002, plaintiff was admitted to Saint Luke's Hospital from the emergency room with a self-inflicted right orchiectomy.[6] He was taken to the operating room on October 7, 2002, for scrotal exploration and irritation. His scrotum was found to be irritated and a drain was left in place. He had a fairly uneventful hospital stay after that. He was evaluated by psychiatry and it was felt that inpatient treatment was not needed. He was discharged October 8, 2002, with a final diagnosis of scrotal injury (Tr. 181).

On October 7, 2002, participated in psychological consultation at St. Luke's regarding self-injurious behaviors. He had been transferred from Western Missouri Mental Health after reporting there for medical attention after excising one of his testicles.  He reported that he cooked it and ate it.

- Plaintiff reported that he was seeing Dr. Sison-Lanes at Truman Behavioral Health Services in the VX building on Charlotte Avenue. He reported seeing her on a three-week basis for medication management and brief supportive therapy. He also reported seeing Dr. Blum, a

_____

[5]Trazodone is used to treat depression.  Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[6]Orchiectomy is the removal of one or both of the testes. Steadman' Medical Dictionary, 27th edition, p. 1271.

13

psychologist at the Don Bosco Center, for supportive cognitive behavioral therapies. He reported being compliant with these treatments, which included taking Celexa,[7] Wellbutrin, and Trazodone, for sleep.

- Plaintiff denied excessive mood disturbance but admitted to disorder of bipolar illness. He reported that he did not feel excessively depressed, and explained his self-inflicted behavior as having had a fetish (and/or desire) to taste human flesh. He reported that he had this impulse for about six months, but had not acted on it. He admitted the impulse became overwhelming and felt tasting his own flesh would not have the legal consequences involving someone else. He denied that this was an attempt to commit suicide. He again said that it was just a way to explore his impulse or desire.

- Plaintiff reported that he had some satisfaction with his current medication. He continued to have some ups and downs in his mood, but not as expansive or for the duration that he did in the past before he was on medications. He reported decreased appetite and decreased sleep.

- Mental status examination reveals plaintiff was alert and oriented. He was assessed with bipolar illness, type II, by his report. It was recommended he restart his psycho tropic medications. At this time, he declined inpatient treatment and planned to follow up with outpatient treatment at Truman Behavioral Services and Don Bosco Center.

(Tr. 182-84).

On October 10, 2002, Truman Medical Center ("TMC") Behavioral called plaintiff to check on how he was doing. He was not at home and was left a message to call TMC Behavioral. He returned the call approximately 45 minutes later. He stated he was at home. He reported he still lived with his partner. He

_____

[7]Celexa is used to treat depression.  Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

14

stated, "I don't have to talk to you anymore. Don't call me at home. I'm going to see the hospital instead of you. My lawyer said not to give you anymore information about myself." (Tr. 204).

On December 18, 2002, plaintiff went to Ronald D. Holzschuh, Ph.D., for a psychological evaluation. He was referred by the state agency requesting history and mental status examination to evaluate him for depression, anxiety, or other psychological dysfunction.

Plaintiff indicated he was disabled because he seemed unable to keep a job. He had been treated for Attention Deficit Disorder as a child and was seeing a psychiatrist every three weeks and a psychotherapist every week at the Don Bosco Center. He had been prescribed Celexa and Wellbutrin.

Plaintiff reported that he discusses being angry when things go wrong: "It seems like when something goes wrong, it just goes one after the other." His ex-wife also generated anger in him. He got the most joy when working on his silversmith creations. Plaintiff feared being alone and also described sadness about being alone.

Plaintiff reported a recent hospitalization where he had removed a testicle and had eaten it. Basically, what he described was a long-term obsession that he finally carried out. He reported some prior self-mutilations, scraping his skin with a

15

razor, again being clear that this was not suicidal.

Plaintiff's intellectual functioning by vocabulary, knowledge, and reasoning were normal.

Plaintiff described his normal day as going to bed at 4 a.m., rising at about 2 p.m., having breakfast, cleaning, and rearranging the furniture around the house. He reported doing the cooking for himself and his live-in boy friend. Two nights per week he served as the security guard for his high-rise apartment building.

Plaintiff appeared to be well-developed and nourished, he was well-dressed and groomed, and he had several stud earrings in each ear and a pierced tongue. Plaintiff demonstrated no unusual behavior; and he was relaxed, very cooperative, and thoughtful in his answers. His speech was normal, with good production, spontaneity, intelligence, and focus; and affect was varied, well-modulated, and appropriate to thought content.

Dr. Holzschuh summarized his visit with plaintiff by noting that plaintiff, "with self-described wander-lust and alternative lifestyle, primarily manifests symptoms of personality disorder". However, the doctor opined that plaintiff was "quite able" to understand and remember both simple and complex instructions. Attention and concentration were adequate, and he described good persistence in several activities, such as caring for his home, cooking, and silver smithing. The doctor added that plaintiff was

16

"pleasantly interactive," and that he continued to be quite able to adapt to changes in his environment.  He was assessed with borderline personality disorder (Tr. at 242-243).

On December 27, 2002, Douglas B. Vaughan, Ph.D., a psychological consultant for the state agency, prepared a Psychiatric Review Technique form on plaintiff. He reported that plaintiff suffers from dysthymic disorder[8] and borderline personality disorder, and showed moderate difficulties in maintaining social functioning as well as in maintaining concentration, persistence, or pace (Tr. 244-254).

Dr. Vaughan also prepared a Mental Residual Functional Capacity Assessment in which he indicated plaintiff was moderately limited in his ability to carry out detailed instructions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavior extremes, to respond appropriately to changes in the work setting, and to travel in unfamiliar places or use public transportation (Tr. 258-59).

On September 8, 2003, plaintiff's doctor at TMC Behavioral prepared a discharge summary regarding plaintiff's treatment history at TMC:

_____

[8]Dysthymic disorder is characterized by chronic depression, but not as severe as major depression.  Psychology Information Online at http://www.psychologyinfo.com/depression/dysthymic.htm.

17

Plaintiff was first seen at TMC in May 2000 with some vague reports of depression and anxiety. He had been prescribed Paxil[9] by WMMHC [Western Missouri Mental Health Center] but stopped taking it because it made him feel hung over.

Plaintiff attended initial psychiatric evaluation on May 12, 2000, and was diagnosed with Dysthymia, rule out alcohol abuse, rule out bipolar disorder, rule out substance-induced mood disorder and rule out borderline personality disorder.

Plaintiff was prescribed Effexor 37.5 mg[10] and Trazodone 50 mg.

In August 2000, the Effexor was increased to 75 mg due to increased depression with decreased attention span and difficulty concentrating.

In October, 2000, the Effexor was changed to Serzone 50 mg[11] and Vistaril 50 mg[12] due to plaintiff's complaining of nausea and vomiting with the Effexor and increased depression.

At his next visit, the dose was increased to 100 mg in the morning and 50 mg in the evening.

The Vistaril was discontinued at the next visit, but was restarted again in March 2001, to combat his increased irritability.

In June, 2001, his medications were changed to Wellbutrin SR 150 mg as he had stopped his other medications two weeks prior. He continued to have problems getting along with

---

[9]Paxil is used to treat depression, obsessive-compulsive disorder, panic disorder, and generalized anxiety disorder. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[10]Effexor is used to treat mental depression and certain anxiety disorders. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[11]Serzone is used to treat mental depression. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[12]Vistaril is an antihistamine used to prevent or treat hay fever or allergies. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

18

people, and had been fired from his job and was expelled from nursing school likely due to his underlying personality disorder. He was referred for psychotherapy.

In August 2000, the Wellbutrin SR was increased to 150 mg and 100 mg at noon.

At his next visit, he was started on Celexa 20 mg in addition to the Wellbutrin.

In May 2002, his medications were changed to Celexa 40 mg, Trazodone 50 mg, and Wellbutrin 150 mg.

In July 2002, the Wellbutrin was increased to 200 mg.

In October 2002, the Celexa was decreased to 20 mg and he was given the primary diagnosis of Borderline Personality Disorder.

Following his discharge soon after that, from Saint Luke's, he returned to the clinic and was persuaded by Dr. Sison-Lanes to go to WMMHC for further evaluation. He left against medical advise before a 96 hour hold could be gotten.

Plaintiff missed the next several appointments and returned December 2002 and was restarted on Wellbutrin SR 100 mg.

At his next visit, Risperdal 1 mg was added.

In March 2003, the Wellbutrin was increased to 150 mg.

At plaintiff's last visit in June 2003, he remained on Wellbutrin SR 150 mg and Risperdal 1 mg. He denied depressive symptoms and self-harm behavior. His sleep, energy and appetite were good.

(Tr. 263-264).

On October 24, 2003, plaintiff went to Eric Aspinwall, M.D., for a physical examination. He complained of pain over his left testicle as well as some increased size of his left testicle. He also reported a history of depression and was going to be seeing the psychiatrist at Tri-County on November 17. He denied suicidal

19

or homicidal ideations.

Plaintiff reported that he would sometimes hear voices, but these voices were not commanding or threatening. He had a history of depression and anxiety. He had a varicocelectomy over his left scrotum in 1986 and 1987. He had a right testicular repair after he removed his testicle himself. This was in 2002.

Physical examination revealed plaintiff only had one testicle and it was somewhat enlarged and mildly tender to palpation. He was assessed with left scrotal pain and depression. He was instructed to keep his appointment with Tri-County Mental Health Services (Tr. 285).

On November 19, 2003, plaintiff went to Grant Piepergerdes, M.D., of Tri-County Health Services for an initial psychiatric evaluation and treatment of his mood problems. The doctor noted that plaintiff said he had multiple piercings and tattoos, including penis and nipple piercings (Tr. 293). Plaintiff appeared dressed casually, but with good grooming and hygiene (Tr. 295). He had poor eye contact and he appeared depressed (Tr. 295). However, he was cooperative and polite, he had linear thought process without evidence of psychosis, he was well-oriented, he demonstrated the ability to perform simple calculations and understand abstract proverbs, and he demonstrated fair insight and judgment (Tr. 295). He reported problems with depression and episodic patterns of irritability

and anger with anxiety. He reported traumatic symptoms from
sexual abuse from his father at an early age as well. He said he
had a depressed mood currently. He reported poor concentration
and memory, excessive sleep and 20 pound weight loss over the
past four to five months. He reported low energy and motivation.
He felt fatigued frequently. He reported anxiety and anhedonia
(absence of pleasure from acts that would normally be
pleasurable). He reported suicidal ideation in the past, but no
homicidal ideation or current suicidal ideation.

Plaintiff stated that over a year ago, he removed his right
testicle though he was not specific on why he did this. He denied
that it was a religious delusion and when asked how he felt about
it now, he stated that he should have tied off the testicular
vein better because it bled and he had to seek medical treatment.
He also reported self-mutilation on his arms.

Plaintiff denied psychotic symptoms. He stated that he did
count numbers in his head frequently, checked door locks, was
forgetful and had periods in which he lost time or others said he
acted differently than his normal self.

Plaintiff reported that he had been treated by an intern or
resident at TMC Behavioral in the last year. He had been
hospitalized at Saint Luke's over a year ago. He had treatment at
Douglas County Community Mental Health in the early 1980's and
possibly other areas as well.

Plaintiff reported that he was currently in school at Penn Valley Community College. He stated that he had difficulty this semester and dropped two of his classes. He had two left.

Plaintiff acknowledged that he was involved in a homosexual relationship with another man.

Mental status examination revealed his eye contact was poor to fair. His mood was "depressed" and affect constricted. He had a history of depressions, possible very brief hypomanias, impulse control problems, psychotic problems and anxiety, post traumatic symptoms, and self-mutilation. He was assessed with major depressive disorder, recurrent, moderate to severe without psychotic features; bipolar disorder, rule out obsessive-compulsive disorder; and post traumatic stress disorder. His global assessment of functioning ("GAF") was 50[13]. He was recommended to restart Celexa 20 mg and Wellbutrin SR 150 mg. He was also recommended to continue psychotherapy (Tr. 293-296).

On December 24, 2003, plaintiff went to Dr. Piepergerdes of Tri-County Mental Health Services reporting that he was feeling better with his medication. He stated that he took some anger out on his partner and was uncertain where that anger had come from, but he believed it might be from his childhood. His mood was

_____

[13]A GAF of 50 means serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).

22

improved. He was not doing any self-mutilation.  Plaintiff was
assessed with depression, post traumatic stress disorder,
personality disorder, and some improvement. His medication was
temporarily changed to Lexapro 10 mg due to the availability of
samples, and Wellbutrin XL 300 mg. He was recommended to discuss
his anger issues with his therapist and to return to the clinic
in six to eight weeks (Tr. 292).

On February 17, 2004, plaintiff went to Dr. Piepergerdes
with complaints that one of his medications was causing him to
have some weakness in his legs when he walks up two flights of
stairs. He was uncertain which one. He was assessed with
depression, personality disorder, post traumatic stress disorder,
and problems with one of his medications. His Wellbutrin XL was
changed to Wellbutrin SR 150 mg. He was to continue the Lexapro
10 mg. He stated that Lexapro seemed to help much better than the
Celexa did. If the leg problems continued, Dr. Piepergerdes
considered switching back to Wellbutrin XL and changing back to
Celexa and increasing the dosage (Tr. 291).

On March 5, 2004, plaintiff went to Dr. Aspinwall with a
one-month history of a rash over his face. He stated that the
rash was itchy and burned at times, especially when he put lotion
on his face. He also wanted to talk to a doctor about a
prosthetic testicle due to the traumatic removal of his testicle.
His current medications included Celexa and Lexapro. He was

23

assessed with seborrheic dermatitis and status post traumatic removal of the testicle. He was referred to the urology department at TMC for evaluation for a prosthetic testicle (Tr. 284).

On March 30, 2004, plaintiff went to Dr. Piepergerdes with complaints of being a little more depressed. He was uncertain why. He was assessed with depression, personality disorder, and post-traumatic stress disorder. He was recommended to continue Wellbutrin SR 150 mg and to increase Lexapro to 20 mg. He stated that the weakness in his legs had not changed with the switch back to Wellbutrin SR. He was asked to make an appointment with Dr. Aspinwall (Tr. 289-290).

On May 18, 2004, plaintiff went to Dr. Piepergerdes reporting that his mood was a little better and he was more "mellow." He had been diagnosed as being HIV positive and was going to start attending an HIV clinic. He had not been started on any retro-viral medicines yet. He was assessed with depression. He was to continue Lexapro 20 mg and Wellbutrin SR 150 mg. He was recommended for regular follow up with Dr. Aspinwall and the HIV clinic (Tr. 298).

On June 10, 2004, plaintiff went to TMC Infectious Disease Clinic with complaints of coughing up thick yellow sputum. Physical examination of the chest showed expiratory wheezing of the lower lobes bilaterally (Tr. 300).

Case 4:05-cv-00507-REL   Document 15   Filed 05/30/06   Page 24 of 39

On June 29, 2004, plaintiff went to Dr. Piepergerdes complaining he had lost some motivation and did not want to leave the house. He lost his job at Circuit City because he had called in sick too often. He was assessed with depression. His Wellbutrin SR was increase to 200 mg and he was to continue Lexapro 20 mg. He was recommended to engage in psychotherapy (Tr. 297).

C. *SUMMARY OF TESTIMONY*

During the hearing, plaintiff testified; and Lesa Keen, a vocational expert, testified at the request of the ALJ.

1. **Plaintiff's testimony.**

At a hearing on August 2, 2004, plaintiff testified that he was 39 years old, stood five feet nine inches tall, and weighed 165 pounds (Tr. 24). He reported that he was a high school graduate and obtained his cosmetology license in 1997 (Tr. 25). He reported that he was in the Navy from 1984 to 1991 and received an honorable discharge (Tr. 43). He reported that he had been attending Penn Valley Community College for the past three years and was studying occupational therapy. Plaintiff stated that he took six hours per semester because he had problems taking more hours than that. He said he could not complete the homework or keep up attendance. He reported that he had problems with concentration and distraction and could not get himself to go to school. He reported that he had to retake two

classes (Tr. 25-28).  He said he had attempted a greater number of hours in the past year, but that he had difficulty with the workload, and had been forced to retake some classes (Tr. 27).

Plaintiff alleged that he became disabled on February 15, 2002, due to depression and anxiety (Tr. 24).

Plaintiff testified he was financing school through a Pell Grant, vocational rehabilitation, and work study program. He said he attended school two days a week last semester and missed seven days (Tr. 28).  His rate of absenteeism had increased.

Plaintiff said he was in the work study program for one year and worked as an assistant to the secretary in the ABLE Access office. This office assists students with brain injuries and other disabilities. His duties included helping students access computers, moving furniture, making copies and performing word processing tasks. He reported that he worked 16 hours each week, but he could come and go as he pleased (Tr. 29-30).

Plaintiff testified that he last worked full time in 2002 as a certified medication technician at the Groves nursing home, where he dispensed medications. He reported that he was fired for insubordination. He said he had trouble getting along with co-workers and supervisors, and he had attendance problems because he could not make himself go to work (Tr. 30-32). Plaintiff testified he could not work full time because he was not dependable enough and had attendance problems because of

26

depression (Tr. 32).

Plaintiff stated that he had suffered from depression since grade school and had received treatment as early as 1974. He described symptoms of his depression. He said he had trouble sleeping, would oversleep at times, was isolated, had suicidal thoughts and tendencies, had bad anger problems, and would self-mutilate. He reported that he had been hospitalized because of mental health problems. In November 2002, he reported that he was hospitalized for four days after he cut out his right testicle and ate it (Tr. 33-34). Plaintiff testified that he continued to engage in self-mutilation, just not as extreme. He said he stabbed himself with needles, and would cut and burn himself. His psychiatrist told him he did this to make himself feel better. He did it when he felt depressed (Tr. 34-35).

Plaintiff reported he sees his psychiatrist every other month and his therapist once or twice a week. His medications include Wellbutrin,[14] Lexapro,[15] and Risperdal.[16] He said he does not get long-term relief from his medications. His medications have changed through the years and he was currently on the

_____

[14]Wellbutrin is an anti-depressant. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[15]Lexapro is used to treat mental depression. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

[16]Risperdal is used to treat the symptoms of psychotic disorders, such as schizophrenia. Medline Plus at http://nlm.nih.gov/medlineplus/print/druginfo.

maximum dosage of Wellbutrin. This dosage was recently increased
because his psychiatrist thought it was not working well enough
(Tr. 35-37). Plaintiff testified he suffers from panic attacks.
They have occurred less frequently because he tries not to go out
in public (Tr. 44). Plaintiff stated that he was diagnosed as HIV
positive on April 29, 2004. Plaintiff reported that this
condition causes him to be fatigued and he experiences side
effects from his medications. Plaintiff stated that he takes
Kaletra,[17] Viread,[18] Convair,[19] and Advair,[20] which cause nausea and
vomiting (Tr. 37-38).

Plaintiff said he experiences weakness in his legs and arms
from HIV. He reported that he has to rest when walking up stairs
and he can carry only five to six pounds. He said that he is able
to do things physically, just not for long periods of time. His
back, legs, arms, shoulders, and neck become sore. He said that
he has problems with concentration and focus. He indicated that

---

[17]Plaintiff reported taking "Kaletra" as an anti-viral (Tr.
125). Kaletra is a drug used in HIV treatment. Medline Plus at
http://nlm.nih.gov/medlineplus/print/druginfo.

[18]Plaintiff reported taking "Viread" as an anti-viral (Tr.
125). Viread is a drug used in HIV treatment. Medline Plus at
http://nlm.nih.gov/medlineplus/print/druginfo.

[19]Plaintiff reported taking "Combivir" as an anti-viral (Tr.
125). Combivir is a drug used in HIV treatment. Medline Plus at
http://nlm.nih.gov/medlineplus/print/druginfo.

[20]Advair is used to treat symptoms of asthma and improve
lung function. Medline Plus at
http://nlm.nih.gov/medlineplus/print/druginfo.

he forgets where he is going and gets lost when driving (Tr. 38-40).

In describing his daily activities, plaintiff testified that he does not get to sleep until 2:00 or 3:00 a.m., but he gets up at 5:00 or 6:00 a.m. He said he cannot get to sleep because his mind is racing. He said he only leaves his home to go to school. He finds it difficult to be in places with lots of people. He indicated that his roommate does the grocery shopping (Tr. 41).

Plaintiff testified that he does not belong to any clubs or participate in social activities. He reported that he cleans his house frequently because he is preoccupied with cleanliness. He said that he gets weak when cleaning. He said he spends his time making things with beads (Tr. 42).

## 2. Vocational expert testimony.

Vocational expert, Lesa Keen, testified at the request of the Administrative Law Judge.

Lesa Keen testified that plaintiff's past relevant work as a security guard was light semi-skilled work, the certified nursing assistant was very heavy semi-skilled work, the certified medication technician was light semi-skilled work, the janitorial job was medium unskilled work, the cosmetologist was light work, and the supply officer was very heavy work (Tr. 50-51).

The ALJ posed a hypothetical question in which he assumed plaintiff's age and education, and continued by asking:

Case 4:05-cv-00507-REL   Document 15   Filed 05/30/06   Page 29 of 39

I would limit him to light work, only because of the HIV problem. I'd like him to avoid the public. And does that fit the requirements of any of his past work? (Tr. 52).

In response to this question, the vocational expert testified that a person with these limitations could perform plaintiff's past part-time janitorial job. The VE stated that the security guard job would depend on when it was performed. If it was a night guard, she noted the likelihood of running into a lot of public would be pretty limited. The vocational expert testified that with these limitations, plaintiff could also perform light, unskilled work as a bench assembler with 9,000 positions in the metropolitan area, light cleaner with 1,500 positions, and light packer with 1,100 positions (Tr. 52-53).

Plaintiff's counsel asked the vocational expert whether the hypothetical person could perform plaintiff's past work or any other work if, in addition to the limitations listed by the ALJ, the person were moderately limited up to one-third of the day in his ability to concentrate and focus. The vocational expert replied that if a person is not maintaining his concentration for a third of the day, he would not be able to maintain the job. Plaintiff's counsel asked if the jobs the vocational expert listed would be affected if a person missed up to two or three days of work per week. The vocational expert replied that such a person would not be able to maintain a job (Tr. 53).

30

## V.  FINDINGS OF THE ALJ

On September 23, 2004, the Honorable Donald R. Colputts, Administrative Law Judge, entered his decision (Tr. 14-19).

The ALJ found that plaintiff has dysthymic disorder and borderline personality disorder, and that these conditions are "severe" in that they have more than a minimal effect on plaintiff's capacity to work (Tr. 16-17).  However, the ALJ observed that these impairments did not meet a listed impairment, and therefore, he went on to analyze whether plaintiff could either return to his past employment or work in other capacities on a sustained basis (Tr. 17).

Based on the record, the ALJ concluded that plaintiff has the residual capacity to perform light work limited only by a need to avoid the public, and therefore could work as a security guard, bench assembler, a cleaner, or a packer (Tr. 17). Accordingly, the ALJ found that plaintiff is not disabled (Tr. 17).

## VI. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

## A.  CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts.  Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988);  Benskin v. Bowen,

31

830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir.

32

1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion.

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows: plaintiff is capable of attending school and working 16-hours per week in work study; he is able to take his medications as prescribed, attend to his medical appointments, drive and do housework; none of his treating physicians has indicated that he is disabled; the state examiner did not conclude that plaintiff was disabled despite his mental limitations; and there was no evidence that the effects of plaintiff's recently-diagnosed HIV are disabling.

### 1. PRIOR WORK RECORD

Plaintiff's earnings record does not add to his credibility. From 1985 to 1990, the period during which plaintiff was serving in the Navy, he enjoyed modest earnings consistently increasing each year. From 1993 to 1995, plaintiff's income dipped, rebounded in 1997 to 2001, and then began to fall again in 2002 to 2003.

Plaintiff's alleged onset date of disability is in 2000. During the decade prior to his alleged onset date, plaintiff's earnings were sporadic and relatively low. For example, in 1995 plaintiff earned only $643.20 ($751.39 in today's dollars). In 1995 minimum wage was $4.25 per hour. Even assuming plaintiff

33

earned minimum wage that year, his maximum hours worked would have been 151 hours, or less than four weeks of full time work. In 1996, plaintiff earned $3,002.42 ($3,343.93 in today's dollars). In 1996, minimum wage was $4.75 per hour, meaning plaintiff worked a maximum of 632 hours, or less than four months of full time work.

Plaintiff's work history suggests that plaintiff's current lack of work is due to something other than his alleged disability.

## 2.   *DAILY ACTIVITIES*

Plaintiff's daily activities do not support his complaints of disability. He drives. He has worked and gone to school. He cleans and rearranges furniture. Indeed, in 2001, Missouri's vocational rehabilitation considered him well enough to pursue higher education and part-time employment, with a goal of securing a permanent position in radiology (Tr. 129-152). Yet, just over a year later, plaintiff applied for disability (Tr. 81-83).

There is nothing in the medical records other than his own statements that supports his allegations of disability due to depression, anxiety, HIV or any other physical or mental condition.

34

### 3.   DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff complains about many disabling symptoms including lack of concentration (Tr. 28, 40), lethargy (Tr. 28), difficulty in walking (Tr. 30), difficulties in getting along with others (Tr. 31), suicidal thoughts and tendencies (Tr. 33), self mutilation (Tr. 34-35), and fatigue and weakness in his arms and legs (Tr. 39).  However, there is little to nothing -- independent of plaintiff's complaints -- in the medical records to support or from which one could reasonably infer that these conditions, either singly or in combination with one another, render plaintiff disabled as defined by the statute.  This factor weighs against plaintiff's credibility.

### 4.   PRECIPITATING AND AGGRAVATING FACTORS

The only precipitating or aggravating factor appears to be plaintiff's exposure to groups of people, which he alleges will trigger anxiety attacks.  Although plaintiff is prescribed medication for this condition, he alleges that he copes with the condition by remaining alone and isolated in his home. My review of the medical records did not produce corroborating medical evidence supporting his need to remain alone. Indeed, there is evidence of defendant spending time "socializing" (Tr. 226). Paradoxically, plaintiff reported that he "fears being alone and also describes sadness about being alone" (Tr. 243).  In any event, the ALJ's hypothetical incorporated a need to avoid

35

working around the public.

This factor does not support plaintiff's credibility.

**5.  *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION***

There is some evidence of defendant becoming non-compliant with his mediation, and the treating physician successfully changing his anti-depression medication because of side effects (Tr. 225, 226, 230, 231-233, 239).  However, the most-recent medical reports show plaintiff doing well on his medication (Tr. 209, 219, 220, 226, 267, 269, 272, 276) or when there was a problem with medication, his doctors were effectively dealing with it (Tr. 220-225, 291, 296).  This factor supports the ALJ's credibility finding.

**6.  *FUNCTIONAL RESTRICTIONS***

Plaintiff testified during the administrative hearing that he has to stop and stand still when climbing stairs, that his legs give out when climbing stairs, that he can lift and carry only five to six pounds at a time, and that he experiences general fatigue (Tr. 38-40).  There is nothing in the medical records supporting this level of restriction.  For example, even after his release from the hospital on October 8, 2002, following his orchiectomy, the medical record shows that inpatient treatment was not ordered for plaintiff's psychiatric condition and that his only physical restriction was against lifting greater than ten pounds for a period of two weeks (Tr. 181).

36

As there are no other medical functional restrictions in the record, I find that this factor supports the ALJ's credibility determination.

**B.    *CREDIBILITY CONCLUSION***

In addition to the above factors, the medical records record several observations questioning plaintiff's credibility. For example, in a December 27, 2002, Mental Residual Capacity Assessment, it is recorded that on October 4, 2002, plaintiff tended to "exaggerate his symptoms" (Tr. 209, 261). In a September 8, 2003, discharge summary, a mental health expert from Truman Medical Center described plaintiff's problems as being presented "with some vague reports of depression and anxiety" (Tr. 263). In addition, plaintiff testified that he goes to sleep at 2:00 to 3:00 a.m. and gets up at 5:00 to 6:00 a.m., meaning he sleeps for about three hours each night. However, he told Dr. Holzschuh that he goes to bed at 4:00 a.m. and sleeps until 2:00 p.m., or ten hours, which is clearly inconsistent with his testimony at the hearing.

Based on all of the above, I find that the substantial evidence in the record supports the ALJ's conclusion that plaintiff's allegations of disability are not credible. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

*VII. ALJ'S HYPOTHETICAL QUESTION TO VOCATIONAL EXPERT*

Plaintiff's second argument is that the ALJ erred by framing a hypothetical question to the vocational expert that did not accurately and completely detail all of plaintiff's impairments. The Commissioner responds by observing that the ALJ correctly included only those impairments for which there was medical support in the record.

The ALJ posed a hypothetical question in which he assumed plaintiff's age and education, and continued by asking: "I would limit him to light work, only because of the HIV problem. I'd like him to avoid the public. And does that fit the requirements of any of his past work?"

In response to this question, the vocational expert testified that a person with these limitations could perform plaintiff's past part-time janitorial job. The vocational expert stated that the security guard job would depend on when it was performed. If it was a night guard, she noted the likelihood of running into a lot of public would be pretty limited. The vocational expert testified that with these limitations, plaintiff could also perform light, unskilled work as a bench assembler with 9,000 positions in the metropolitan area, light cleaner with 1,500 positions, and light packer with 1,100 positions (Tr. 52-53).

38

The ALJ is not required to include in a hypothetical question to a vocational expert complaints which he or she concludes are not supported by the record. Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005). The ALJ need only include those impairments that are credible. Pertuis v. Apfel, 152 F.3d 1006, 1007 (8th Cir. 1998); Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997).

Here, the ALJ included in the hypothetical question to the vocational expert only those limitations to plaintiff's functional capacity specifically supported by the record. Therefore, plaintiff's motion for summary judgment on this basis will be denied.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's determination that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 30, 2006

39